**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION,<br><br>and<br><br>AIRLINE PROFESSIONALS ASSOCIATION TEAMSTERS LOCAL UNION NO. 1224,<br><br>Plaintiffs,<br><br>v.<br><br>HORIZON AIR INDUSTRIES, INC.<br><br>Defendant. | CASE NO.<br><br>COMPLAINT |

## INTRODUCTION

1. Plaintiffs International Brotherhood of Teamsters, Airline Division ("IBT"), and Airline Professionals Association Teamsters Local Union No. 1224 ("Local 1224"; together with the IBT, the "Union") bring this action for declaratory relief, injunctive relief, and other appropriate relief under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151, et seq., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, against Defendant Horizon Air Industries, Inc. ("Horizon Air").



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

2. Plaintiffs seek a declaration that Horizon Air has violated the *status quo* working conditions by requiring Union-represented pilots who report fatigue from their home bases to deadhead (i.e., fly as passengers) to out stations before receiving at least ten hours' rest, notwithstanding unambiguous contract language in the parties 2022 Letter of Agreement ("2022 LOA") prohibiting this practice. Plaintiffs further seek preliminary and permanent injunctive relief compelling Horizon Air to abide by the terms of the 2022 LOA and to restore the *status quo ante* by ensuring that all Union-represented pilots who report fatigue from their home bases receive the minimum ten-hour periods of rest before being deadheaded to out stations for trip assignments.

**JURISDICTION AND VENUE**

3. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337.

4. Personal jurisdiction over Horizon Air exists in this district because Horizon Air maintains substantial operations at the Seattle–Tacoma ("SeaTac") Airport (located within the Western District of Washington). Horizon Air's contacts within this district are sufficiently continuous and systematic as to render them at home within this judicial district. Additionally, the claims at issue here arise substantially from Horizon Air's activities that occurred within this judicial district.

5. Venue is proper in the Western District of Washington pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because: (a) Horizon Air resides in this judicial district; (b) it conducts substantial operations in this district; and (c) a substantial number of the events giving rise to this Complaint occurred in or relate to operations within the territorial confines of this Court's jurisdiction.



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

## PARTIES

6. Plaintiff IBT is an unincorporated labor organization. Through its Airline Division, the IBT is the exclusive bargaining "representative," as defined by Section 1, Sixth of the RLA, 45 U.S.C. § 151, Sixth, of the pilots employed by Horizon Air. The IBT is headquartered at 25 Louisiana Avenue N.W., Washington, D.C., 20001. This action is brought by the IBT on its own behalf and for and in the interests of all IBT-represented employees in the service of Horizon Air. The IBT provides day-to-day representative services to the Horizon Air pilots through Plaintiff Local 1224. As of October 1, 2026, Horizon Air employs approximately 656 pilots.

7. Plaintiff Local 1224 is an unincorporated labor organization headquartered at 2754 Old State Route 73, Wilmington, Ohio, 45177. Local 1224 is a chartered affiliate of the IBT. As such, Local 1224 provides labor representation services to pilots employed by cargo and passenger airlines throughout the United States. The IBT has delegated to Local 1224 the exclusive responsibility of providing day-to-day representation to the Horizon Air pilots.

8. Horizon Air is a regional airline based in SeaTac, Washington. It is a Washington corporation and a wholly owned subsidiary of Alaska Air Group, Inc. ("AAG"). AAG owns three sister subsidiary airlines: Alaska Airlines, Inc. ("Alaska Airlines"), Hawaiian Holdings, Inc. ("Hawaiian Airlines"), and Horizon Air. All of Horizon Air's scheduled flights and all of its aircraft passenger capacity are marketed exclusively to and sold by Alaska Airlines. The Union is the exclusive bargaining representative of Horizon Air's pilots. Horizon Air is a "carrier" within the meaning of the RLA, as provided in 45 U.S.C. § 181.

## FACTS

### I. Union-Represented Pilots' Conditions of Employment Are Governed by a Collective Bargaining Agreement and Letter of Agreement, the Terms of Which Remain the *Status Quo* While the Parties Negotiate a Successor Contract.



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

9. Horizon Air and the Union are signatories to a collective bargaining agreement ("CBA") effective from February 1, 2016, with an amendable date of December 31, 2024.

10. In 2022, Horizon Air sought to reopen and amend the CBA to address challenges recruiting and retaining qualified pilots. The Union agreed to reopen the CBA for that purpose and bargaining commenced. As enunciated in the recitals of the agreement the parties subsequently reached, the express intent in reopening the CBA was to "mak[e] certain improvements to the CBA" in order to "retain and attract Pilots to fly our anticipated fleet... and support future growth … ."

11. The product of negotiations following the CBA's reopening was the 2022 LOA, executed by representatives of both parties on September 2, 2022, and subsequently ratified by Horizon Air's Union-represented pilots on September 16, 2022. The 2022 LOA amended a number of different CBA provisions and also introduced new terms that took effect on October 1, 2022.

12. Separately, on December 5, 2022, pursuant to the parties' CBA and Section 6 of the RLA, 45 U.S.C. § 156, the Union served notice on Horizon Air that it intended to open and commence negotiations for the purpose of amending the parties' CBA. The first bargaining conference between the Union and Horizon Air to negotiate amendments to the parties' CBA occurred in February 2023. The parties have held bargaining conferences approximately monthly since February 2023, with meetings continuing through the date of this filing. Neither Horizon Air nor the Union has terminated conferences nor requested mediation from the National Mediation Board, and the National Mediation Board has not proffered its services.

13. The Union's issuance of this "Section 6 notice" and the parties' ongoing negotiations under Section 6 preclude Horizon Air from altering Union-represented pilots' "rates of pay, rules, or working conditions" until statutorily mandated negotiation and mediation efforts



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

have been exhausted. 45 U.S.C. § 156; 45 U.S.C. § 152, Seventh ("No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."). More generally, the RLA requires Horizon Air "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions … ." 45 U.S.C. § 152, First.

14. To date, the parties have not reached a successor agreement or exhausted the RLA's negotiation and mediation requirements. Accordingly, the RLA continues to prohibit Horizon Air from unilaterally altering Union-represented pilots' rates of pay, rules, and working conditions, as embodied in the CBA and 2022 LOA.

## II. The 2022 LOA's Fatigue Pay Provisions Expressly Require Horizon Air to Immediately Release Pilots into Rest Status When They Report Fatigue from Their Home Bases.

15. Among the supplemental terms negotiated in the 2022 LOA is a provision titled "Fatigue Pay," which is embodied in Section 1.k thereof. In accordance with the 2022 LOA, Section 1.k became effective on October 1, 2022, and remains in effect through the date of this filing and the duration of the existing CBA.

16. Section 1.k of the 2022 LOA has its foundation in the Federal Aviation Administration (FAA) regulations (FARs) concerning flight and duty limitations and rest requirements. *See* 14 C.F.R. §§ 117.1–117.29.

17. The FARs prohibit pilots from accepting assignments to a flight duty period if the pilot reports that he is "too fatigued to safely perform his or her assigned duties." 14 C.F.R. § 117.5(b). "Fatigue means a physiological state of reduced mental or physical performance capability resulting from lack of sleep or increased physical activity that can reduce a flightcrew



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

member's alertness and ability to safely operate an aircraft or perform safety-related duties." 14 C.F.R. § 117.3. Section 2 of the parties' CBA defines "Fatigue" identically.

18. Another FAR mandates that a pilot receive at least 10 consecutive hours of rest before beginning reserve or flight duty. 14 C.F.R. § 117.25(e).

19. However, the FARs do not address whether pilots are entitled to compensation for duty time they would have performed but for complying with the fatigue call-out requirement. Nor do the FARs determine whether pilots must receive rest before deadheading in a non-flight crew capacity to another location to rejoin a trip assignment.

20. Prior to the 2022 LOA, the CBA lacked any pay protections for Horizon Air pilots who refused assignments due to fatigue. Nor did the pre-2022 CBA prescribe the sequence by which a fatigued pilot receives a rest period and returns to flight duty. The 2022 LOA specifically addressed these subjects.

21. First, the 2022 LOA instituted pay protection for fatigued pilots, so long as a newly created Fatigue Review Panel determined that the root cause of the fatigue was outside the pilot's control.

22. Second, the 2022 LOA created a reticulated scheme determining when fatigued pilots receive their 10 hours of rest and when and how they can return to flight duty. The timing of pilots' rest periods and Horizon Air's options for returning them to duty are governed by two variables: the type of pilot—Lineholder or Reserve—and the location from which the pilot reports fatigue—at his home base or during a trip assignment away from base.

23. The CBA's definitional section (Section 2) defines a "Lineholder" as "a Pilot who has an assigned Flight Duty Period and is not acting as a Reserve Pilot." It defines a "Reserve Pilot" as "a Pilot who the Company requires to be available to receive an Assignment for Duty."



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

The same section defines "Rest Period" as "a continuous period determined prospectively during which a Pilot is free from all restraint by the Company, including freedom from present responsibility for work should the occasion arise." Finally, it defines "Home Base" as "the airport designated by the Company from which a Pilot's Duty or Assignment(s) begin and end unless otherwise stated in this Agreement."

24. For Lineholders who call out as fatigued "in base," Section 1.k.i.1 of the 2022 LOA states as follows:

a. The Pilot will be immediately placed into at least ten (10) hours of rest.

b. Following rest, Crew Scheduling may:

    i. Release the Pilot from the remainder of the assignment.

    ii. Reconnect the Pilot with the original trip as it transits his Base.

    iii. Deadhead the Pilot to reconnect with the original trip.

25. Conversely, for Lineholders who call out as fatigued "away from base," Section 1.k.i.2 of the 2022 LOA states that "Crew Scheduling may, per FAR and CBA limitations, assign the Pilot as follows:

a. Deadhead to the next layover location to enter rest, and then resume the original trip, or

b. Be released into rest at the out station and, after rest, Deadhead or fly to rejoin the original trip, or

c. Deadhead to Base and be released, or after rest, Deadhead to reconnect with the original trip, or fly from Base on the original trip.

d. If the Pilot is placed into rest while away from Base he will receive transportation and lodging."



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

26. Unambiguously then, when a Lineholder calls out fatigued from his home base, Horizon Air must "immediately" release him for at least a ten-hour rest period. Only after the fatigued Lineholder has rested does the 2022 LOA provide options for Horizon Air to reintegrate him into his trip schedule, either by joining a trip assignment at his home base or by deadheading to a layover location/out station along a trip assignment's itinerary. Meanwhile, when a Lineholder calls out fatigued away from his home base, the 2022 LOA permits Horizon Air to direct the pilot to deadhead to his base or to the next out station/layover location before receiving rest, in the alternative to releasing the pilot for rest immediately.

27. Rest sequencing works similarly for Reserve Pilots. When a Reserve Pilot calls out fatigued from his home base "for an assignment or Reserve Availability Period (RAP)," Section 1.k.ii.1.a of the 2022 LOA provides that "[t]he Reserve Pilot will be immediately released into rest and will be available at the start of his next available reserve period."

28. But when a Reserve Pilot calls out fatigued away from his base, Section 1.k.ii.2 of the 2022 LOA provides that "Crew Scheduling may, per FAR and CBA limitations, assign the Pilot as follows:

a. Deadhead to Base and be released, or

b. Be released to rest at the out station and, after rest, Deadhead or fly to the original assignment or a new assignment.

c. If the Pilot is placed into rest while away from base he will receive transportation and lodging."

29. Thus, also unambiguously, the 2022 LOA non-discretionally requires Horizon Air to "immediately" release Reserve Pilots into ten-hour rest periods when they report fatigue from their home bases. But it grants Horizon Air discretion to provide Reserve Pilots who report fatigue



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

away from their bases with rest either immediately or after deadheading them back to their home base or to another out station.

30. Horizon Air itself proposed the foregoing language, which was drawn verbatim from a 2019 letter of agreement between Alaska Airlines and the Air Line Pilots Association ("ALPA"), the union that represents Alaska Airlines' pilots. The Union agreed to import that language into the 2022 LOA with no material changes.

**III. Beginning in July 2026, Horizon Air has Unilaterally Altered Union-Represented Pilots' Working Conditions by Requiring Pilots to Deadhead to Out Stations Before Receiving Rest, Even When They Report Fatigue from Their Home Bases.**

31. Between October 1, 2022, when the 2022 LOA took effect, and July 2026, the Union did not receive any complaints from Lineholders or Reserve Pilots who had called in fatigued from their home base that Horizon Air required them to deadhead to an out station before receiving rest.

32. However, beginning in July 2026, on at least five occasions, the Union has received reports from individual pilots that Horizon Air has required them to deadhead to out stations before receiving rest, when those pilots reported their fatigue status from their home bases.

33. The first known incident occurred on or about July 14, 2026, when Reserve Pilot Austin Braver called in fatigued from his base in Portland, Oregon. Instead of immediately releasing him into rest status, a Crew Scheduler and a Flight Operations Duty Officer ordered him to deadhead to Vancouver, British Columbia, and begin his rest there. Braver had no choice but to comply with the directive.

34. The second known incident occurred on or about July 22, 2026, when Lineholder Pilot Kyle Boaz called in fatigued from his base in Portland, Oregon. Instead of immediately releasing him into rest status, a Crew Scheduler ordered him to deadhead to Vancouver, British



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

Columbia, and begin his rest there. Boaz raised the 2022 LOA terms but was rebuffed. He therefore had no choice but to comply with the Crew Scheduler's directive.

35. The third known incident occurred on or about July 28, 2026, when Lineholder Pilot Zachary Ng called in fatigued from his base in Portland, Oregon. Instead of immediately releasing him into rest status, a Crew Scheduler ordered him to deadhead to Ontario, California, and begin his rest there. Ng contacted Crew Scheduling to alert the airline to its violation of the 2022 LOA. In response, the Crew Scheduler accused Ng of "refusing the assignment." Faced with the threat of discipline, Ng had no choice but to comply with the directive.

36. The fourth known incident also occurred on or about July 28, 2026, when Lineholder Pilot Mychal Hornbeck called in fatigued from the airport his base in Portland, Oregon. After notifying Crew Scheduling, Hornbeck left the airport to return to his home for rest. Upon arriving at his home, Hornbeck received a message indicating that instead of immediately releasing him into rest status, a Crew Scheduling agent had assigned him to deadhead to Ontario, California, and begin his rest there. Hornbeck contacted Crew Scheduling to inquire into the basis for the deadhead directive and to advise that he was no longer at the airport to accept the deadhead assignment. The Crew Scheduler he spoke to claimed Hornbeck had been informed of his deadhead assignment and that the "fatigue" notation in Hornbeck's flight records would be removed and replaced with an "XX" notation.

37. The fifth known incident occurred on or about August 15, 2026—after the Union's August 7, 2026, cease-and-desist letter and Horizon Air's August 12, 2026, response, described below—when Lineholder Pilot Eric Widell called in fatigued from his base in Seattle, Washington. Instead of immediately releasing Widell into rest status, a Crew Scheduler directed him to



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

deadhead to Reno, Nevada, and begin his rest there. Widell had no choice but to comply with the directive.

38. On information and belief, since July 2026, Horizon Air has issued similar deadheading directives on other occasions to pilots reporting fatigue from their home bases.

39. On information and belief, Horizon Air is utilizing this deadheading practice because it is short-staffed with pilots and finds the provisions of the 2022 LOA overly restrictive from an operational standpoint. Rather than using contractually permissible tools to ameliorate the staffing issues or negotiating changes with the Union as part of the parties' ongoing Section 6 negotiations in accordance with the RLA, Horizon Air has compelled pilots reporting fatigue from their home bases to deadhead to out stations to make them available for duties the airline has not otherwise covered.

40. Horizon Air did not inform the Union before unilaterally changing the pilots' working conditions from those established by the 2022 LOA and has never sought the Union's consent to do so.

### IV. The Union Exhausted Reasonable Efforts to Resolve Horizon Air's Unilateral Change to the *Status Quo* Without Judicial Intervention.

41. Between July 22 and August 25, 2026, the Union filed grievances over the incidents described in Paragraphs 32–37 above. The Union initially filed these grievances because it assumed the incidents were isolated errors rather than unilateral changes to the pilots' working conditions established by the 2022 LOA. The Union only later learned that Horizon Air did not consider the scheduling of these pilots to be errors, and instead, that Horizon Air had, in practice, changed the pilots' work rules.

42. On August 3, 2026, Paul Rutter, Chief Counsel for Local 1224, spoke with Angela May, Senior Corporate Counsel for Alaska Airlines, acting as agent for Horizon Air. Rutter



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

expressed alarm that the multiple recent instances of Horizon Air requiring fatigued pilots to deadhead to out stations from their home bases appeared to reflect a pattern and policy and explained the Union's position that this new policy violated the unambiguous terms of the 2022 LOA's Fatigue Pay provisions.

43. On August 7, 2026, the Union, via Rutter, sent Horizon Air, via May, a cease-and-desist letter identifying Horizon Air's deadheading practice as a violation of the *status quo* and a unilateral alteration of Union-represented pilots' working conditions, in violation of the RLA. The Union demanded "the Company immediately cease and desist from further violations of the status quo concerning its handling of fatigue calls." Specifically, the Union insisted that "upon receiving a fatigue call from a pilot in Base, the Company must immediately place the pilot into rest; the Company may not delay or defer that rest for any reason, including to accomplish a deadhead." The Union requested confirmation of the status quo's restoration by August 10, 2026.

44. On August 12, 2026, May responded to Rutter by email. Via May, Horizon Air denied that its deadheading practice violated the 2022 LOA or the RLA's *status quo* obligations. Significantly, May did not deny the 2022 LOA's unambiguous terms, nor did May cite any terms of the existing agreement as establishing the right to take the disputed action. Rather, she claimed that (1) when those unambiguous terms were bargained, the parties did not intend to change what she characterized as Horizon Air's pre-September 2022 "fatigue-management practices"; (2) Horizon Air had identified other instances of Crew Scheduling deadheading fatigued pilots both before and after the 2022 LOA, permitting the company to continue what she characterized as a "practice"; and (3) Horizon Air's "Flight Operations Manual" (FOM)—a corporate manual that Horizon Air revises without the Union's agreement, and that is subordinate to the CBA and the 2022 LOA—further authorized its actions.



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

45. On September 17, 2026, representatives of the Union and Horizon Air met to discuss labor management issues, including the foregoing cases. During the meeting, Henry Simkins, Local 1224's Horizon Air Pilots Executive Council (ExCo) Chairman, requested that Horizon Air agree to pause its deadheading practice until an arbitrator could rule on the issue. Horizon Air's representatives declined to provide an answer at the meeting.

46. On September 30, 2026, Frans Miller, Horizon Air's Director of Labor Relations, informed the Union that Horizon Air "will maintain its current practice while the matter proceeds through the parties' grievance and arbitration process," thereby further refusing the Union's request to restore the status quo that existed before the airline's unilateral change to Union-represented pilots' working conditions.

## CAUSES OF ACTION

### COUNT I
### (Violation of Section 2, First of the RLA)

47. The allegations of paragraphs 1 through 46 of the Complaint are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

48. Section 2, First of the RLA, 45 U.S.C. §152, First, states:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

49. The sequencing of pilots' rest periods following fatigue call-outs in relation to their return to flight duty is a rule and/or working condition within the meaning of RLA Section 2, First.

50. By unilaterally requiring Union-represented pilots reporting fatigue from their home bases to deadhead to out stations before receiving rest, Horizon Air failed and refused to



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

exert every reasonable effort to maintain agreements as to rates of pay, rules and working conditions, and so violated RLA Section 2, First.

**COUNT II**
**(Violation of Section 2, Seventh, of the RLA)**

51. The allegations of paragraphs 1 through 50 of the Complaint are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).

52. Section 2, Seventh, of the RLA, 45 U.S.C. § 152, Seventh, states:

> No carrier, its officers, or agents shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreement or in section 156 of this title.

53. The sequencing of pilots' rest periods following fatigue call-outs in relation to their return to flight duty is a rule and/or working condition within the meaning of RLA Section 2, Seventh.

54. The 2022 LOA is an agreement within the meaning of RLA Section 2, Seventh.

55. Horizon Air has not exhausted the negotiation and mediation requirements of RLA, Section 6, 45 U.S.C. § 156.

56. By unilaterally requiring Union-represented pilots reporting fatigue from their home bases to deadhead to out stations before receiving rest, Horizon Air has unilaterally changed Union-represented pilots' rules and working conditions without exhausting the RLA's negotiation and mediation procedures, and so violated RLA Section 2, Seventh.

**COUNT III**
**(Violation of Section 6 of the RLA)**

57. The allegations of paragraphs 1 through 56 of the Complaint are incorporated by reference pursuant to Fed. R. Civ. P. 10(c).



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

58. Section 6 of the RLA, 45 U.S.C. § 156, states, in pertinent part, that whenever a party:

> ….give[s] at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working condition … or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party, or said Board has proffered its services, rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 155 of this title, by the Mediation Board, unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.

59. The sequencing of pilots' rest periods following fatigue call-outs in relation to their return to flight duty is a rule and/or working condition within the meaning of RLA Section 6.

60. The Union provided the requisite written notice of an intent to reopen the parties' agreement, within the meaning of RLA Section 6 and the parties have been engaged in Section 6 bargaining since at least February 2023.

61. The National Mediation Board has not finally acted upon the controversy, within the meaning of RLA Section 6, so as to release Horizon Air from the RLA's prohibition on altering rates of pay, rules, or working conditions for Union-represented pilots.

62. By unilaterally requiring Union-represented pilots reporting fatigue from their home bases to deadhead to out stations before receiving rest, Horizon Air has altered Union-represented pilots' rules and working conditions without exhausting the RLA's negotiation and mediation procedures, and so violated RLA Section 6.

## PRAYER FOR RELIEF

Wherefore, the Union requests that the Court grant the following relief:



18 WEST MERCER ST., STE. 400
SEATTLE, WASHINGTON 98119
TEL 800.238.4231 | FAX 206.378.4132
BARNARD IGLITZIN & LAVITT LLP

1. A declaration that Horizon Air has violated Section 2, First; Section 2, Seventh; and Section 6 of the RLA by unilaterally requiring pilots reporting fatigue from their home bases to deadhead to out stations before receiving rest;
2. A preliminary and permanent injunction ordering Horizon Air and its officers, agents, and representatives to:
   i. Restore the lawful *status quo*, embodied in the 2022 LOA;
   ii. Cease and desist from violating the terms of the 2022 LOA;
   iii. Immediately provide Union-represented pilots at least ten hours' rest, when they report fatigue from their home bases;
   iv. Provide a copy of this Court's order to every Union-represented pilot, by email and certified mail at their most current address of record, in order to ameliorate the effects of Horizon Air's violation of these pilots' rights under the RLA;
3. An award of the Union's attorneys' fees and costs;
4. Such further relief that the Court deems just and equitable.

RESPECTFULLY SUBMITTED this 23rd day of October, 2026.

*s/Ben Berger*
Ben Berger, WSBA No.: 52909
*s/Marina Multhaup*
Marina Multhaup, WSBA No: 58877
**BARNARD IGLITZIN & LAVITT LLP**
18 West Mercer Street, Suite 400
Seattle, WA 98119
Tel: (206) 257-6006
Tel: (206) 257-6001
berger@workerlaw.com
multhaup@workerlaw.com

*Counsel for Plaintiffs*